Good morning, Your Honors, and may it please the Court, Parth Sigdeo for Petitioner Vutoro Mualevu. Are you the only person that's arguing today? I see someone else at council table. Yes, Your Honor, I'm the only person arguing. Okay, thank you. May it please the Court, Parth Sigdeo for Petitioner Vutoro Mualevu. I'll reserve four minutes for rebuttal. Mr. Mualevu petitions this Court to vindicate his due process rights to an interpreter. This Court has repeatedly explained, and the government does not contest, that when an alien is not fluent in English, the IJ must provide the alien with an interpreter. Here, the IJ expressly stated that Mr. Mualevu was not fluent in English, yet because the IJ could not find an interpreter, she proceeded to conduct Mr. Mualevu's merits hearing without one. By proceeding with Mr. Mualevu's merits hearing without an interpreter, despite recognizing that he was not fluent in English, the IJ erred as a matter of law. This Court should vacate the removal order and remand the case for a new merits hearing with an interpreter present. Mr. Mualevu has met any burden to show prejudice. So is it your position that if a non-citizen who is not fluent in English alleges he will be tortured if returned to his home country, the government cannot remove that citizen unless it first provides the non-citizen with an interpreter? I would say as a general matter, that's true. If the facts underlying the non-citizen's Convention Against Torture claim are to be elicited at a merits hearing, and the non-citizen isn't fluent and isn't provided an interpreter, that would be a due process violation. So what if they can basically understand everything, but, I mean, what is non-fluent? Well, Your Honor, I guess, you know, one could look at, say, a dictionary definition of fluent, and Merriam-Webster defines it essentially as communicating with ease. And I would say that's, you know, that kind of tracks this Court's cases, where if a non-citizen can't fully express themselves, if the non-citizen can't understand what the questions are by the I.G. or by the government's attorney, then that's a level of proficiency. Does the I.G. have to take the petitioner's word for it? I don't think so, Your Honor. I think it's a determination that the I.G. makes. So why isn't this effectively a credibility determination? That is, he said he needed an interpreter, and the I.G. said, I understand that you've had an interpreter before, but you filled out your application in English, you conducted other various interviews in English, you've done some things in Fijian, you've done some things in English. On balance, I'm going to proceed. Why isn't that a credibility determination to which we owe some deference? Well, as an initial matter, it doesn't seem like that was the reasoning that the I.G. used. The I.G. basically said, well, Mr. Molavu speaks and understands some English, and therefore we're okay proceeding without an interpreter. I don't think the I.G. was making a finding of fluency. In fact, the I.G. stated the opposite. She stated, I recognize you're not fluent in English, Mr. Molavu. And so— I mean, fluent means what? I mean, if we're talking about the State Department, we're talking then about native fluency, yes, and that's pretty apparent that he's not fluent in that sense. But she asks him repeatedly, do you understand? And he repeatedly responds, yes, ma'am, yes, ma'am, and has some lengthy explanations of various incidents that occurred. So, Your Honor, returning to your point about credibility, the I.G. here found Mr. Molavu to be overall credible, and that was at the end of the hearing, and that credibility finding, to the extent that that is the question, should be in Mr. Molavu's favor. And as for her asking him at specific instances, do you understand, sometimes he says yes, sometimes he essentially says no. So how many times did he come to court? Wasn't it like seven times? I mean, this isn't a very long period of time, right? There were several issues in the case, you know— But how many hearings did he have? I believe roughly seven, Your Honor, is correct. Not all of those hearings were merits hearings, not all of those hearings were kind of—were postponed on the basis that he didn't have an interpreter. You know, at issue in his proceedings at first was kind of his competency, and there were— What's the standard of review that we apply to the prejudice determination? Your Honor, as we talked about in the briefing, there should be a presumption of prejudice here. Well, if there's a—so you're saying a presumption of prejudice. I know that there's some declaration—he's just going for cat relief, right? That's one claim. There's some declaration or affidavit in there as to what he would have said. That's correct. If we think that that wouldn't satisfy cat relief, does that overcome the presumption of prejudice? I don't think so. If he's not entitled—if his—he's given us his best argument now, and it's—I mean, cat's a pretty high bar. And it—I mean, I'm going to say hypothetically, if we don't think that what you said he would say would entitle him to cat relief, why would we give him relief? Why would—why can't he show prejudice? One thing—one thing to that, Your Honor, is his declaration does not purport to be the universe of things he would have said. It's some of the things he would have said. And were this remanded, he may well have said—he may well have— Well, he's counseled. He's been to court seven times. When's he going to tell us the universe of what he would say? I mean, you don't leave out that—you know, you don't leave out torture if it's there, right? Well, I think even, you know, putting aside the declaration, I would submit it as it's not this Court's role to kind of fact-find on the basis of the declaration in the first instance. That should go back to the IJ, and, you know, there should be a back-and-forth. Well, but if you say there's a presumption of prejudice, then that presumption can be and it's not CAT. I would— I mean, there's cases out there that say what CAT is as a matter of law. That's true, Your Honor, but as I understand the presumption kind of explained in the Fourth Circuit decision in Guterro in citing this Court's decision in Aguiman, the presumption really goes to whether there is something in the record that, you know, kind of sufficient information in the record to conduct a prejudice inquiry, and that's really not true here because he wasn't able—Mr. Muleva wasn't able to tell his full story, and so the things that the IJ relied on— The declaration that we do have was through an interpreter, I'm assuming, correct? That's correct. Okay. And I kind of— So if I say that's not enough, then you say, well, I would have to do better, but you have to kind of do your best at some point. Yeah. So the way that the, you know, these Immigration Court proceedings are structured is somewhat of a colloquy in my limited experience. There's a back and forth between the IJ and the noncitizen. You know, the IJ may ask for further questions for clarification, and it's through the process of the noncitizen being there with the IJ that the IJ can probe into all the relevant details. That's not the procedural posture we're at right now, and I would submit that that was—that is a good reason to send it back to the IJ to kind of conduct this. Let me take you back to that you say we should presume prejudice. Do you have any Ninth Circuit authority that presumes prejudice based on a determination that the IJ did not fully develop the record? What's your best authority for this? The Agyeman case is a good example. That was a case where this court found that the IJ didn't satisfy their duty to develop the record, and the court said an alien need not—a noncitizen need not point to record evidence that does not exist. It's kind of where the IJ's failure to develop goes to the heart of the claim. Prejudice—it didn't use the word presume, but it essentially didn't require— So does that case stand for the proposition that it presumes prejudice, or are you asking us to extend that? I don't find—I'm not aware of a Ninth Circuit case that says that you presume prejudice. So, Your Honor, I'm not sure that I—that there's a case that uses the word presumption, but I would say that kind of functionally that case did presume prejudice. I'm also aware of another case, a Ninth Circuit case, in which an interpreter was not provided at a hearing, and the court basically said—and there was evidence presented at that hearing that was later relied on, and the court essentially said, well, because that hearing was constitutionally inadequate, the removal order can't be sustained. That's Chung-Yun Chu v. Boyd, 309 Federal Circuit. You want to supplement the record, right? But the cases you cite aren't immigration cases. Do you have any immigration cases where a similar supplement has been granted? So I think one example of an immigration case—I believe this was an immigration case. Rosales-Martinez v. Palmer, which is cited in our motion, involved—actually, so it kind of involved a situation in which there was a kind of extra-record evidence that was—actually, that may not have been an immigration case, but there was an extra-record evidence that was considered by the court, and the court said, justice requires considering this, and therefore it was considered. And I would kind of also circle back, Your Honor, to the idea that kind of the absence of record evidence in this case is precisely the reason that prejudice should be presumed. So your client doesn't qualify for any other relief but CAT. Is it because of his criminal record? That's correct. Which is? He was convicted of attempted murder, and he served time for that, and so he's— Was that here? Yes, in this country. I'm wondering how your argument in favor of a presumption of prejudice can be reconciled with LATA, which you rely on. Because LATA says, to prevail on a due process challenge to deportation proceedings, LATA must show error and substantial prejudice. The showing of prejudice is essentially a demonstration that the alleged violation affected the outcome of the proceedings. We will not simply presume prejudice. Your Honor, I believe LATA was an ineffective assistance of counsel case, not a case in which the petitioner said that he was not provided an interpreter despite being entitled to one. And I think the kind of distinction between, for example, ineffective assistance of counsel cases and cases in which counsel was outright denied is illustrative here. For example, in the Sixth Amendment context, ineffective assistance claims require specific prejudice, but a denial of counsel is essentially prejudice is presumed, or the error is kind of demonstrated just on the basis of counsel being denied improperly. And in kind of looking to that distinction, the Supreme Court has justified the different prejudice standards for a denial versus ineffective claim on the basis of the different ability to assess prejudice. You know, it's just much harder to figure out what would have happened where counsel was absent outright than when counsel was there but allegedly ineffective. And the exact same kind of reasoning applies here, where, you know, there's a number of involvement sites involving allegedly ineffective interpreters, and this Court has used a specific prejudice standard. But where the interpreter was due and not provided, I think it makes sense to presume prejudice in the same way that it's done for denial of counsel cases. So do you want to reserve the balance of your time? Yes, Your Honor. All right. Thank you. We'll hear from the government. Good morning. Good morning. May it please the Court. Robert Tennyson for the government. I'll start off with... Just get close enough to that. Oh, get close... Because it helps Judge Collins here. Oh, okay. Got it. Thank you. All right. Thank you. Robert Tennyson for the government. Very briefly, I'll start with the declaration and why it should be excluded. Under Fisher, this Court, on Bonk, has said that it can't consider extraterritorial extra record evidence unless it's referred to by the Court or is somehow a conditioned precedent of the Board's decision, right? And it just hasn't been included by the Court. Or, alternatively, in Dent, where the extra record evidence is a government record that specifically conflicts with some assertion made by the government within procedures. Well, it is definitely outside the record. It wasn't before the agency. I get that. But can we look at it for the limited purpose of whether he was denied due process? I mean, in terms of... I mean, we evaluate due process from the record that we have. We can't look outside of it. If we're confined to the record, I have to say, it's really disturbing that he would come in and had conducted a number of proceedings with a translator and would come in and say, I would prefer a translator. And the IJ says, well, if we had one, we'd give you one, but we can't find one so tough. It's a little... This is a facilitating process here to everything else that's going to follow, to ensure that he understands and that he can express his thoughts and that the IJ can understand any complicated stories he wishes to tell, for which he may or may not have adequate vocabulary. His responses of, yes, ma'am, to all of her questions is very polite. But if you're trying to express complicated facts, you may not have the vocabulary for that if this is not your first language. Right, Your Honor. So I'll start with the immigration judge conducts seven hearings, right? There are two of them with an interpreter. There are a couple of countervailing considerations here. I know that this court, in a couple of cases, has said that fluency is the standard. I believe, for example, Katetz has said that fluency is the standard. But that's more of a benchmark than an actual hard line. And the question is whether or not the petitioner sufficiently understands the language here in English, such that they can meaningfully participate within proceedings. I believe that is not only, what, cartoony. I think that, I don't, I believe that it's also con Paris' last story. They all, it's not fluency. It's understanding. It's the ability to meaningfully participate. And the petitioner here, the immigration judge, reasonably evaluated the circumstances of the case. The immigration judge looked at the fact that, you know, he's from Fiji. And Fiji was formerly a British colony. The official documents of the country are in English, right? He has a birth certificate of Fiji. The Fijian document, the birth certificate isn't translated. It's in English because English is an official language in Fiji. Yeah, but counsel, that wouldn't even go in the United States. That wouldn't fly here. We have so many people who, for which English is not their first language, for lots of very complicated reasons. We would never use that as a measure for saying, well, sorry, you've been in the United States for a long time, so you, we're just going to do this in English, whether you understand this or not. Right. But he also, in his visa application, he states that he speaks English. It's not just Fijian. He also speaks English. Some people are conversational in English, but it may be very difficult to explain. Again, you may not, you may have, you may be able to go out down the street and order a hot dog and chips, but not be able to explain, you know, complicated things because you lack vocabulary. Now, it's pretty clear from the record that they would have allowed him to use a translator if they had had one. So this appears to be a ruling for the government's convenience. I'm not sure I understand why, if the government can, if the government is willing to concede, the IJ was willing to concede, that had a translator been available, that they would have supplied one, and I certainly have seen plenty of transcripts where somebody spoke some English, had a translator, and attempts to answer some, or offer some explanation, or even correct the translator, and the IJ has come in and said, no, you've elected your remedies. You want to do this in Spanish, we're doing it in Spanish, but I'm not going to let you flip back and forth between English and Spanish. MR. RUIZ. Your Honor, I think the benchmark that we have to look to here is not simply whether or not the petitioner stated a desire to speak in the GN, but whether or not the immigration judge and counsel for the government were able to bring out the facts of his claim. MS. RUIZ. He needs to have a translator. MR. RUIZ. I think that would be best practice, and I think the immigration courts do try to do that. MS. RUIZ. Well, but does the law require it, or is, or what are, you know, I'm trying to. MR. RUIZ. I don't believe the law requires it. I think the law requires it. I mean, there was a recent case, it's an unpublished case from this Court. Gosh, what's the name of it? I've actually got it listed here. Agbon, Judge Collins, you were on the case, where an individual wanted to participate in pigged-in English, right? But this Court found that the individual, despite the fact that they spoke pigged-in English, was nonetheless able to meaningfully participate within proceedings. The same is the case here. I mean, despite the fact that English may, he, despite the fact that he may not have been fluent, and the immigration judge said he wasn't. MS. RUIZ. So why is this, okay, why is this not a due process violation here? What is your best argument here? MR. RUIZ. The best argument is that he could meaningfully participate in proceedings. He sufficiently understood English that he could meaningfully participate. What's this?  RUIZ. What shows that? MR. RUIZ. His responses were clear. We know what his claim was. We know that he had two cat claims, right? The first claim being that he was beaten within his village by other individuals there with a rope because they have an animosity towards individuals who are not, who do not have parents or known fathers within the area. We also know with respect to the other claim having to do with his cousin and his two uncles that that had to do with those, with the cousin and the uncles siding with George Spate in the coup in 2000. That's not only in his testimony. That is in his application. And if you look at all of the record documentation that he brings with it, everything that all of his politically based claim has to do or has to do with that 2000 coup. What standard of review do we apply to the BIA's determination of no prejudice?  RUIZ. Determination of? MS. No prejudice.  RUIZ. Of? MS. No prejudice. MR. RUIZ. Of no prejudice? That is, I believe that's a no, I believe that's de novo. It's a, it's a, it is a legal determination about the possibility of, the possibility of future relief, right? Um, so the question with regard to prejudice is whether or not, uh, it's potentially outcome determinative. Uh, the due process violation would be potentially outcome determinative, um, based upon sort of, and this is, uh, Bartolome, uh, specifically, specific indications in the record. So the petitioner has to specifically indicate what it is that would have changed, but all he has to show is that it would be potentially outcome determinative. Um, and here the petitioner, before the board, did not offer any statement of what would be specific, you know, did not specifically identify anything that would have changed had he had an interpreter. That's all the outside, outside record. Counsel, can you, is there any place in the record where the IJ actually makes a finding that he understands English well enough to proceed? Um, I believe there's a statement that he understands English that the immigration judge makes very early on. Is there anything in the I, in the IJ's written opinion? The IJ's written opinion doesn't really talk about it. There's like a line or two about midway through. I couldn't find, I couldn't find anything. Right, right. But there's no... No, the BIA's, um, decision actually does supply some additional things. I mean, they, they, they've, they've talked about in completing the, the I, uh, 589. Right. Uh, the mental health review and so on. The, the I, the BIA at the top of page two of its decision, which is AR3, um, says that to establish prejudice, the alien must show that a better translation would have made a difference in the outcome of the hearing. That's where an alien complains that an interpreter is incompetent. Right. What, what, what standard do we apply when he's been refused an interpreter that he's asked for that he's previously been supplied by the agency? Right. Um, and you're asking me whether we require prejudice or not? Well, I'm, I'm, I want to know what, what, what kind of, if, if we require prejudice, what kind of prejudice does he have to show? Because the, because the standard the BIA has cited here doesn't fit this situation. Right. Um, I believe the prejudice standard would be whether or not it's potentially outcome determinative. I mean, whether or not he... How would we know if it's outcome determinative if we don't have answers to questions that he can understand? I mean, that's the whole problem is that the translator is sort of facilitative of everything that follows. Right. I believe that in his brief, he could have said, what I would have said is this. But that's what he does in the declaration, which now you don't want us to look at. You don't want us to look at it. But if we looked at it and looked at it and said, that's not, wouldn't entitle him to cat relief. That's why I'm wondering why you're objecting to that coming in. Um. Because it really is a peek under the covers of that. That declaration is with an interpreter and is allegedly, this is what I would have shown. Right. But he's got to actually exhaust the prejudice requirement and exhaust the prejudice, his prejudice finding before the board. The BIA starts by saying, by reciting that do process requires that an alien be given competent translation services into a language that the alien understands if he does not speak English. Why isn't that just determinative of the case? Why isn't that... The BIA didn't say anything about prejudice. It only, it only goes to a prejudice finding, um, when, when somebody's complaining about the quality of the translation services they've been supplied. It, that, that doesn't apply to this case. So now what, with the BIA's own statement suggests that he was denied due process here. We don't have to worry about prejudice. So I would indicate that in this kind of case, it's probably easier to establish prejudice than it would be in the trans, in the bad translation circumstance, right? If he says he didn't understand it, what are we supposed to do with that? The IJ can't get inside his head. Uh, if, if the I, if the IJ wants to make a credibility finding and says you're lying, uh, that would be different. But you and I have both discussed that there's no such finding by the IJ and that the IJ acknowledges he would have been given a translator if one had been available. The IJ does acknowledge a translator would have been available, it would have been given if available. But again, the IJ says, but you nonetheless understand, I, I believe that you nonetheless, nonetheless understand, uh, English. It's good, it's, it's good enough for your CAC claim. And the thing is, is that it's good enough for your CAC claim, especially considering that you are detained. Um, and that, that. Wait, wait, what does the detention have to do with good enough for your CAC claim? Right. I, that sounds like that, that the problem there, counsel, and this, and I, I understand where you're coming from, I think it's wrong, but this is where the IJ was coming from was, you're in detention, you've been here for a long time, we can't delay this any further, we're going to try you with or without a translator. That's what comes through the hearing, the hearing. Right. And there's a standard below which that would be bad. That would, that would definitely be a constitutional violation. But the question is whether or not he could meaningfully participate. And we can look at the record here and his responses to the immigration judge and to the, um, to the government attorney and say he did understand, well, he did understand. So where is he right now? Where is he right now? Um, I didn't check. I assume he is, he remains detained to this day. Wow, it just feels like we could have gotten a, a, a, a translator on another day and, and just solve this whole thing on the merits. If we can find a translator, yes. There are no Fijians in the United States. That was, that was the problem. I mean, they kept trying to find a Fijian translator. The one who, who they had, uh, had departed, had no longer was doing the work and they couldn't line up another. Um, why isn't this, why isn't this situation analogous to the body of law that we have over failure to develop the record? Because if it's clear that according to even the BIA's own standards that a translator should have been provided, then we're in a situation where we don't know what we don't know. And we have a body of law in the failure to develop the record, uh, where we assess prejudice, um, in that context. Why isn't that like this? And why wouldn't we apply the same standards here, which are somewhat forgiving to the alien? Um, well, your honor, I think that this is different than a failure to develop, develop the record. I mean, the immigration judge did attempt to develop the record here. We have a full record. The problem is, but the, the difficulty, we don't have a full record because, because we, we didn't have a translator for the person who needed to offer the facts. Right. But that's more of a problem of the petitioner couldn't meaning, uh, of whether or not the petitioner could meaningfully present his case. I suppose the two are tied, linked together to some extent in this circumstance, but I would say it's more along the lines of whether or not the petitioner could meaningfully develop. Well, it's hard to believe there are no Fijian interpreters and that the government's obviously spent a lot of money to bring you out from Washington, D.C. And I see that, uh, pro bono counsel is from Boston. So we're spending a lot of, and not that we get paid a lot of money, but we're getting paid some money to be here. There's, it's, it's a lot of, it's, it's a lot to spend when I can't believe there's not a Fijian interpreter somewhere. I, I, I found it challenging as well. Um, but presumably the agency has its, its resources. It has a way of finding interpreters. And in this instance, um, after I believe four hearings, um, after it, after the Fijian interpreter departed, they couldn't find one. And I, we can't look behind the record to figure out beyond the fact that we know that the Fijian interpreter. In the criminal case, did he have an interpreter? Do we know that? We do. I bet he did. I do not know if he had one. We don't know? We don't know. We do know that he. He'd never do a criminal trial without an interpreter if someone was demanding it. Right. Um, presumably if he demanded it, he had one. We don't know. What we do know, or what it looks like is that when he was arrested, um, he spoke to an officer. There's no indication in that report that his conversation with the officer took place with an interpreter. Um, as opposed to him speaking English to the officer. So, but that's all we have. We don't have anything about the criminal trial itself. Can I ask a question? I believe he bled. Can I ask a question about the BIA's procedure? Um, do the rules of the BIA's procedures allow aliens to present new facts on appeal, um, with their, uh, brief challenging the IJ's decision? I mean, our rules don't, don't permit that. We decide on the district court record subject to very limited judicial notice exception. So, what would happen is, is that in his brief on appeal, he would say, this is what I would have testified to. This is my declaration. Um, please remand this back to the immigration judge for a new hearing, presumably with a translator. Um, uh, um, and then the immigration court, you know, the board could have said, oh, okay, so not only did you not have a translator, we know what you would have said now. Is he required to do that? The immigration, the board is not required to do that. The board, if it, if it finds that, um, for example, there's no prima facie, that he wouldn't have made a prima facie case, even had he had, even had he been able to testify exactly what he had wanted to testify to. If there was something that he didn't, that he had wanted to say that he left out, um, the board could say that doesn't make a difference, right? That there's no prima facie determined, there's no prima facie case here and no prima facie cause to remand the case. Um, and there are also other discretionary factors, but generally, uh, a motion to remand the case back based upon these additional facts, uh, would have given the board the opportunity to have considered that in the first instance, as opposed to us receiving the declaration, um, in the petition for review. Uh, at this point. Any additional questions? All right. That, uh, we've taken you over, but, um, you've answered all our questions. Thank you. Um, all right. You have a little bit of rebuttal time left. So one thing I just wanted to touch on is this is the first time at, at argument that the government is now contending that fluency is not the standard. In the, in their brief, they use the fluency standard, um, and did not dispute that, that if an alien is not fluent in English, that, uh, they aren't entitled to an interpreter at their marriage hearing. Um, uh, council cited Bartolome for, for a support of, you know, the specific instances, uh, uh, prejudice requirement, but Bartolome was a case alleging an ineffective translator, which, um, uh, as we've discussed is, is kind of on entirely different footing than where here, where there was no translator provided at all. Um, and just kind of atmospherically, I would like to note that the previous IJ in this case was able to find an inter, a Fijian interpreter, uh, in about, in less than two weeks. Uh, and, and that we, um, in preparing Mr. Molivo's case, uh, were able to find one in about eight days. Um, uh, if there are no further questions, Your Honor. All right. Um, there don't appear to be. Thank you both for your argument. And I see, um, I believe you were pro bono counsel. Were you through our pro bono program? Oh, yes, Your Honor. All right. Well, we, I would like to say thank you on behalf of the, the court and obviously thank you to the government as well. But obviously it's helpful to us when, uh, lawyers are willing to do that and to brief the issues. And thank you very much. Thank you, Your Honor.
judges: BYBEE, CALLAHAN, COLLINS